## LAWRENCE v. UNITED STATES.

### (Circuit Court, D. South Carolina. January 2, 1896.)

1. **SUBROGATION.**
   A contract for the construction of a United States courthouse provided that the government might withhold any part of the sums to be paid the contractor, in case of the latter's failure to promptly pay laborers and material men. A bank, from time to time, lent money to the contractor, with the expectation that it would be used in carrying out his contract, but without any obligation to that effect, and some of it was used by him for paying laborers and material men. *Held*, that as the laborers and material men had no enforceable rights against the government, and the payment by the bank of the money used to pay their claims was purely voluntary, there was no room for the application of the principle of subrogation in the bank's favor.

2. **SAME—BENEFICIAL EXPENDITURES.**
   Nor was the equitable principle allowing to a bona fide holder compensation for beneficial expenditures applicable in favor of the bank, since the money paid by it was not used in removing an incumbrance resting on a title, or in paying debts having behind them a quasi lien or a trust.

3. **BUILDING CONTRACT—RIGHT TO WITHHOLD FUNDS.**
   The government being given the right to withhold part of the fund only in case of the nonpayment of laborers or material men, the bank could not ask that this right be exercised in its favor, as the representative of claims of the laborers and material men which had been paid.

4. **SAME.**
   In such case, since the laborers and material men had no right to the fund withheld by the government, which belonged wholly to the contractor, the bank could not acquire any rights in such fund as the representative of such laborers and material men.

5. **PAYMENT.**
   A note is not payment of an account, unless it be expressly accepted as payment, or produce payment.

6. **SAME.**
   Where one to whom a draft is given for payment of an account accepts it and sells it to another, without assuming any guaranty or personal liability, neither of them can make any claim under the original account.

7. **COUNSEL FEES—PAYMENT OUT OF GENERAL FUND.**
   Where a contract with the United States authorized the latter to withhold payment of part of the contract price in case of failure to promptly pay laborers or material men, no one but the contractor could bring pro-

ceedings for the distribution of a fund so withheld; and hence his counsel, bringing such proceedings, are entitled to compensation out of such fund.

Cothran, Wells, Ansel & Cothran, for plaintiff.

Julius H. Heyward, Haynsworth & Parker, and I. C. Jeffries, for petitioner.

SIMONTON, Circuit Judge. This case now comes up upon the report of the special master under the order of 26th September last. A recapitulation of some of the facts of the case is necessary. The government concluded a contract with James R. Lawrence for building a courthouse and post office in Greenville at and for the sum of $76,290. The building has been completed and accepted. Payments were made to Lawrence from time to time as the work progressed; in all, $67,999.01. There has been withheld by the government, from the contract price, the sum of $7,601.06. This was done under a clause in the contract which gives to the United States the right and privilege of withholding any portion of the sum of money to be paid to Lawrence under the provisions of the contract, in the event of the failure of Lawrence to promptly make payment to all persons who may supply him with labor and materials in the prosecution and completion of the work therein provided for. The reason assigned by the government for withholding this sum was the number of claims against him, which had been filed in the department, for labor and materials supplied in connection with his contract for said building. In the present action the government admits that this sum has been withheld, but it exercises this right and privilege secured under the contract, and insists that the money thus withheld be paid to such persons as come within this favored class. The Greenville Savings Bank, at Lawrence's request, made an arrangement with him under which it lent him moneys, from time to time, secured by the hypothecation of his claim against the government for work done and to be done under his contract. There is some confusion in the testimony, but the preponderance of the evidence is that Lawrence intended, and the bank knew his intent, to use the money thus lent to him in the performance of his contract. As each check came to Lawrence in the payment of the work as it progressed, it was delivered to the bank, and he indorsed it, and then the proceeds were put to his credit on general account. He made no special account for this purpose. There is no evidence that the bank bound itself absolutely to furnish to Lawrence all the money needed for this purpose, or that the bank could not discontinue its loans whenever it pleased. The bank paid no money to any laborer or material man. All the money was paid to Lawrence, to be used by him; he stating that he wanted it for his contract, but being under no obligation or contract so to apply it. In prior proceedings in this cause the bank claimed the entire sum withheld by the government, insisting that it was covered by this hypothecation. This claim has been disallowed. But the special master was instructed to take such testimony as bore upon the

question, "Has the bank any right to be subrogated to a claim, pro rata, on this fund, for so much of the money it advanced as was used for pay of laborers or material men?" He has made his report, showing how much of this money was used for this purpose. How does this affect the claim of the bank to any part of the fund?

The term "subrogation," used by the court in its order, was not happily chosen. "Subrogation" involves the idea of a right existing in one, with which another, under certain circumstances, is clothed, —a right capable of enforcement. A surety pays the debt of his principal. He is subrogated to all the rights of the creditor, and is entitled to the protection of all the collaterals held by him,— rights which he can enforce. But these laborers and material men have no rights, as against the government,—rights which can be enforced. There is no privity between them and the government. They are recipients of its bounty, debtors to its good will, objects of its provident care, in whose favor, suo motu, it exercises its right and privilege to withhold the money until their claims are satisfied. Nor have they any specific interest in the money so withheld. It is not necessarily applicable to their claims. Lawrence could satisfy them in any way, and, upon evidence that their claims were arranged, he could get the money which had been withheld. So "subrogation" is not the term to be applied to this transaction. If subrogation existed at all, it must be as to the rights of the laborers and material men to whom Lawrence paid the money the bank lent to him. As has been seen, they had no rights. To give existence to this equity of subrogation, it was necessary not only that the bank, in some way or other, was bound for the amount due to them or interested in its payment, and that it was not at liberty to make this payment or not, at its election. Insurance Co. v. Middleport, 124 U. S. 534, 8 Sup. Ct. 625; Brown v. Gadsden, Speer, Eq. 37. It must also appear that at the time of the payment the laborers and material men were invested with rights to which the bank succeeded, and which it could enforce. The supreme court of the United States, in Insurance Co. v. Middleport, 124 U. S., at page 548, 8 Sup. Ct. 625, quotes with approval Sheldon on Subrogation, as follows:

"The doctrine is derived from the civil law, and it is said to be a legal fiction, by force of which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another. It takes place for the benefit of a person who, being himself a creditor, pays another creditor, whose debt is preferred to his by reason of privileges or mortgages; being obliged to make the payment, either as standing in the situation of a surety, or that he may remove a prior incumbrance on the property on which he relies to secure his payment. Subrogation, as a matter of right, independently of a judgment, takes place only for the benefit of insurers, or of one who, being himself a creditor, has satisfied the lien of a prior creditor, or of a co-obligor or surety who has paid the debt which ought, in whole or in part, to have been met by another. The doctrine is not applied for the mere stranger or volunteer who has paid the debt of another without any assignment or agreement for subrogation, without being under any legal obligation to make the payment, and without being compelled to do so for the preservation of any rights or property of his own."

The same case quotes with high commendation the language of Johnson, Ch., in Brown v. Gadsden, Speer, Eq. 37, who says, among other things:

"The doctrine of subrogation, from its very nature, never could have been intended for the relief of those who were in any condition in which they were at liberty to elect whether they would or would not be bound."

It also quotes the language of Chancellor Walworth in Sandford v. McLean, 3 Paige, 122:

"It is only in cases where the person advancing money to pay the debt of another stands in the situation of a surety, or is compelled to pay it to protect his own rights, that a court of equity substitutes him in the place of the creditor, as a matter of course, without any agreement to that effect. In other cases the demand of a creditor which is paid with the money of a third person, and without any agreement that the security shall be assigned or kept on foot for the benefit of said third person, is absolutely extinguished."

In the present case the laborers and material men had no dealing whatever with the bank. And the bank never bound itself absolutely to pay them. If the bank can be relieved at all, it must be on some other equity than that strictly called "subrogation."

The bank furnished money to Lawrence on his installments from the government, and after a while on what it conceived was a valid hypothecation of his claim, under his contract, against the government. Money was furnished, Lawrence stating that it was intended to be used in paying for labor and materials in completing this contract; and a large part of it was so applied. The hypothecation which was the consideration for the part of this loan now unpaid has been found invalid, null, and void. The laborers and material men have been paid out of the money furnished by the bank. The bank, however, has a large sum due to it and unpaid. There is a principle of equity which provides that, when one bona fide pays his money in the purchase of any kind of property, the money so paid to be applicable to obligations of the vendor, and the purchase and sale fail by reason of any irregularity or invalidity in the sale, the purchaser so paying his money is put in the place of the creditors who received it, and occupy the same position towards their debtor as they did before their claims were so discharged. Thus, A. purchases realty, bona fide believing that he is getting a good title, and, to clear it, pays off existing liens. If the title prove defective, and he be ousted by the true owner, he will be placed in the position of the creditors whose liens he has paid. Bailey v. Bailey (S. C.) 19 S. E. 670. So if lands of a deceased person are sold for payment of his debts, and the sale be declared invalid, any purchaser who has paid his money, and it has been applied to the debts, will occupy the position of the creditors who are so paid, in the administration of the assets. Freem. Void Jud. Sales, 51; Har. Subr. § 762. Also, if a sale be made to foreclose a mortgage, and the money applied towards its satisfaction, if the sale be declared invalid the mortgage will be revived, and its lien used to protect the purchasers. The great case of Bright v. Boyd, 1 Story, 478, Fed. Cas. No. 1,875,

lays down the rule, affirmed in Bank v. Hudson, 111 U. S. 83, 4 Sup. Ct. 303:

"Where the owner of an estate, after a recovery thereof at law from a bona fide possessor for a valuable consideration, without notice, seeks an account in equity, as plaintiff, against such possessor, for the rents and profits, courts of equity will allow him to make a deduction therefrom of all the meliorations and improvements made beneficially by him on the estate, and thus to recoup them from the rents and profits. The same doctrine holds in cases where the owner of an estate has only an equitable title thereto. The Roman law also allowed compensation for all beneficial expenditures, and, if a bona fide holder of an estate paid money to discharge any existing incumbrance or charge upon it, he was entitled to reimbursement pro tanto."

In Kanawha Coal Co. v. Kanawha & O. Coal Co., Fed. Cas. No. 7,606, a creditor, under a deed of trust, sold land of a debtor during the war; the debtor living within the Confederate lines. and the property lying in West Virginia. The sale was set aside, but the purchaser was protected by the debt his money had paid. In Davis v. Gaines, 104 U. S. 386, where the purchase money paid at a void sale was applied to the extinguishment of a valid mortgage, it was held that, "notwithstanding the irregularity or invalidity of the sale, the purchaser cannot be ousted unless the purchase money be repaid or tendered."

In one of the cases quoted by counsel for the bank, it appears that the assets of an insolvent corporation had been sold to pay its debts. The sale was subsequently declared invalid. The purchaser whose money had been used to pay off the debts of the corporation was permitted to stand in the place of the creditors who were paid by his money. When this case is examined, it will be seen that it proceeds upon the principle that the assets of an insolvent corporation are a trust fund for its creditors. The purchaser whose money paid off these creditors succeeded to their beneficial interest in the trust. St. Louis & S. Coal & Min. Co. v. Sandoval Coal & Min. Co. (Ill. Sup.) 5 N. E. 370. Can this equity be administered in favor of the bank? It will be noted that in every case quoted the money paid was used either in removing incumbrances resting on the title, or in paying debts having behind them a quasi lien or a trust, and which, as Mr. Pomeroy says, "would be recoverable at law." 3 Pom. Eq. Jur. § 1300. In the case at bar no debt was paid with this money which relieved any incumbrance which was protected by any quasi lien or a trust, or which was a debt of the government, or recoverable at law. Let the transaction be analyzed. Certain laborers performed work, and certain material men contributed material to the building, at Lawrence's request, and under contract with him. He was an independent contractor. They were paid with money borrowed by him from the bank. If by this the bank were entitled to stand in the shoes of the laborers and material men, against whom could it claim? Not against the government, for it had no contract with these laborers and material men. But it is supposed that, as the government had a right to withhold the fund in favor of this class, the bank could ask that this right be exercised in its favor. The

terms of the contract gave the government the right and privilege of withholding part of the fund only "in the event of the failure of Lawrence to promptly make payment to all persons who may supply him with labor and materials in the prosecution of the work." But the position taken by the bank goes upon the idea that all of this class in whose shoes it wishes to stand were promptly paid. The postulate upon which the right and privilege of the government depended did not exist. There was nothing for the bank to take. Let the case be regarded from another standpoint. The position of the bank is that it furnished to Lawrence a certain amount of money; that Lawrence used it in the construction of the public building,—paying laborers and material men. If the bank has any equity, it must work it through Lawrence. It can have no greater right than he. If Lawrence can claim to be a beneficiary in this fund for the excess unpaid to the bank, because he expended the money for labor and materials, he could make a similar claim for all the money he expended for the same purposes, —a proposition which refutes itself. But the government exercises its right and privilege of withholding the fund against Lawrence himself. Without this proviso it would have no right to withhold anything, but would be bound to pay it over to Lawrence. By virtue of this proviso it retains the money, and insists that it be distributed among those who have not been promptly paid. Until they are satisfied, Lawrence has no right to the fund, nor has the bank. There is still another view of this case. The contract gave to the United States the right and privilege of withholding a part of the contract price, for a specified reason,—that laborers and material men were not promptly paid. This right and privilege the United States could exercise or not, at its option. Until it was exercised, Lawrence could demand the money earned on his contract. The United States did not exercise this right and privilege until 9th February, 1894, when Lawrence demanded payment of this balance. Then, for the first time, the requirement was made that the outstanding claims, all or nearly all of which were on file in the department, should be paid. Lawrence recognized the propriety of the demand, and consents that this money be thus applied. Until this was done, the laborers and material men—those who were paid, and those remaining unpaid—had not a shadow of interest in the money in the treasury, and could give none to the bank, nor could Lawrence derive any from them.

It appears that G. D. Barr & Sons furnished labor and materials to Lawrence, in the construction of the building. He gave them his note for $415.88. This note never has been paid, and is now in the possession of G. D. Barr & Sons. It was discounted by them in the Greenville Savings Bank, but they have been compelled to pay it. The note was taken for an open account. A note is not payment of an account, unless it be expressly accepted as payment, or produce payment. If the note be dishonored, the holder may proceed on the account. If the note be negotiable, it must be produced and surrendered. Barr & Sons can prove for

the amount of the account, $415.88 and interest, as the maker of the note liquidated the demand at its date.

The notes discounted for the accommodation of Lawrence, indorsed by G. D. Barr & Sons, are not entitled to a dividend on this fund.

It appears that Lawrence was indebted to William E. Springer & Co. in the sum of $668.84 for hardware used in the building. He gave them a draft on the supervising architect of the treasury department for this amount, chargeable on the amount due him on his contract. This Springer & Co. accepted, and afterwards sold to Mr. Norwood; not assuming, as far as the evidence shows, any guaranty or personal liability therefor. The draft is valueless. Mr. Norwood cannot resort to the original account, for Springer & Co. cannot do so. They took the draft and used it, selling it for what it would bring. The claim is disallowed.

The attorneys for the plaintiff make application for a fee out of the fund. This application is resisted by the attorneys for the creditors. It will be remembered that the contract with the government authorized the United States to withhold payment of part of the contract price in case of failure promptly to pay laborers and material men. This was all. The United States could not pay these people. It could simply withhold the money until they were paid. The proceedings in this case, therefore, were necessary, and no one could bring them but Lawrence. The suit brought the fund into court, and gave the United States every assurance that was necessary. In this way, and in this way only, have the creditors been able to get any money. Counsel are entitled to compensation. Their fee is fixed at $300. The fees of the special master are fixed at $125. Let proper orders be prepared.